UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
MORRIS S. CAMMY,

                    Plaintiff,                    **MEMORANDUM AND ORDER**

          -against-                               12-CV-5810 (KAM)

CAROLYN W. COLVIN,
Commissioner of Social Security,

                    Defendant.
---------------------------------------X
**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. §§ 405(g), Morris Solomon Cammy

("plaintiff" or "Cammy") appeals the final decision of the

Commissioner of Social Security ("defendant"), which found that

plaintiff was not eligible for disability insurance benefits

under Title II of the Social Security Act (the "Act"), on the

ground that plaintiff is not disabled within the meaning of the

Act.

          Plaintiff alleges that he is disabled under the Act

and is thus entitled to receive the aforementioned benefits.

Presently before the court are defendant's motion for judgment

on the pleadings and plaintiff's cross-motion for judgment on

the pleadings.  For the reasons stated below, plaintiff's motion

is GRANTED in part and DENIED in part and the case is remanded

for further proceedings consistent with this memorandum and

order.

1

**<u>BACKGROUND</u>**

**I.** Procedural History

On September 17, 2009, plaintiff Morris S. Cammy filed an application for social security disability insurance benefits, claiming that he had been disabled since February 27, 2009, due to a heart attack, high blood pressure, high cholesterol, shortness of breath, and carpal tunnel syndrome. (ECF No. 1, Administrative Transcript ("Tr.") 107-08.) The alleged onset of disability was initially filed as February 27, 2009, but later amended to July 26, 2009. (Tr. 41.) Thus, the relevant period for disability determination is from July 26, 2009 through April 18, 2011, the date of the Administrative Law Judge's decision. (Tr. 41.)

On December 15, 2009, the Social Security Administration ("SSA") denied plaintiff's application for social security disability insurance benefits on the basis that he was not disabled. (Tr. 61-64.) On January 13, 2010, plaintiff requested a hearing before an Administrative Law Judge. (Tr. 67-71.) On January 25, 2011, plaintiff appeared and testified before Administrative Law Judge ("ALJ") Margaret L. Pecoraro, represented by Nicole J. Kim, Esq., of Binder and Binder. (Tr. 37-59.) By a decision dated April 18, 2011, the ALJ determined that plaintiff was not disabled within the meaning of the Act and thus not entitled to disability insurance benefits. (Tr. at

21-31.)  Specifically, the ALJ found that plaintiff had the Residual Functional Capacity ("RFC") to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), and that plaintiff was capable of lifting/carrying and pushing/pulling ten pounds occasionally and less than ten pounds frequently.[1]  (Tr. 24.)  The ALJ further found that plaintiff was able to sit for six hours total and stand/walk for two hours total in an eight hour workday, and had no postural, environmental, manipulative, or mental restrictions.  (*Id.*)

On May 10, 2011, plaintiff appealed the ALJ's decision to the Appeals Council, and on September 27, 2012, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)  On November 26, 2012, plaintiff filed the instant action in federal court. (ECF No. 1, Complaint.)

## II.  Factual Background

### A.   Plaintiff's Non-Medical History

Plaintiff was born on January 24, 1952.  (Tr. 107.) He was 57 years old at the alleged onset of his disability,

---

[1] Sedentary work is defined as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567.

February 27, 2009, as result of chronic heart failure. (Tr. 107, 166.) Plaintiff later amended the onset date to July 26, 2009. (Tr. 41, 123.) Plaintiff is a citizen of the United States and speaks and understands English. (Tr. 107, 128.)

Plaintiff resides in Flushing, New York, in a three floor walk-up, which he testified is difficult for him to climb. (Tr. 52.) Plaintiff is married and has one daughter, Dawn Cammy. (Tr. 108, 138.) He lives with his daughter in Flushing, New York while his wife and grandson reside in Atlanta, Georgia. (Tr. 49.) On a typical day, plaintiff reads, watches television, listens to music, cooks for himself and his daughter, and takes care of his two cats. (Tr. 49, 138, 142.) Plaintiff shops for food once a week. (Tr. 142.) Plaintiff also takes a one-mile walk on a daily basis, but claims it is difficult due to his leg pain. (Tr. 49.) He is able to walk for three blocks before he needs to stop and rest for five minutes. (Tr. 144.) Plaintiff does not socialize regularly, and spends time with others once a month. (Tr. 143.) Plaintiff also goes to "pitch and putt golf" once a month. (*Id.*) Plaintiff reported that he can go out alone, but does not have a driver's license and travels by bus. (Tr. 141.) Plaintiff also indicated that he does not travel by train in order to avoid climbing flights of stairs. (Tr. 49, 143.) Plaintiff reported no problems paying attention, finishing tasks, following spoken

or written instructions, or getting along with others.  (Tr. 144.)

Plaintiff reported that he completed at least two years of college; however, he testified that he had only completed one year.  (Tr. 42; Tr. 134.)  Plaintiff previously worked as accounting clerk at Standard Motor Products for thirty-four years, but became unemployed on February 28, 2009, when the company downsized and let him go.  (Tr. 43, 129.)  Plaintiff received a severance package until January 2010.  (Tr. 43.)  At his previous employment, plaintiff's daily work consisted of activities including walking seven hours; standing one hour; sitting for six hours; climbing for half an hour; handling, grabbing and grasping big objects for half an hour; reaching for half an hour; and writing, typing, or handling small objects approximately seven hours per day.  (Tr. 131-32.)  In addition, plaintiff frequently lifted a box that weighed ten pounds and carried it about twenty feet.  (Tr. 131-32.)  Plaintiff's yearly earnings for the past fifteen years range from $29,839.28 (1996) to $43,891.18 (2009).  (Tr. 115.)

A.    Plaintiff's Medical History

Plaintiff has presented medical records dating back to July 26, 2009.  (*See generally* Tr.)  The discussion below addresses plaintiff's testimony regarding his symptoms as well as the medical evidence and opinions in the record.

1.  <u>Plaintiff's Treating Sources</u>

    a.  *New York Hospital Queens*

On July 26, 2009, plaintiff was admitted to New York Hospital Queens for treatment of "severe substernal chest pain" and underwent a left heart catheterization, left ventriculography, and coronary angiography which showed total occlusion of the Ramus and significant left anterior descending artery ("LAD").  (Tr. 174, 261-63.)  An emergency intervention was performed, and stents were placed in his Ramus and LAD arteries to reduce the stenosis, or narrowing of the arteries from 50% to 0% and 90% to 0%, respectively.  (Tr. 174.)  Upon referral by Dr. Daniel Blum, Dr. John Nicholson conducted a transthoracic echocardiography, which revealed that plaintiff possessed normal heart chamber sizes, normal left ventricular systolic function, and mildly elevated right ventricular/pulmonary artery pressure.  (Tr. 180.)  The report, however, noted that the study was "technically difficult due to "poor acoustic windows."  (Tr. 180.)

Plaintiff was discharged on July 28, 2009 and prescribed medication including Plavix, Ecotrin, Lipitor, Metoprolol, and Altace.  (Tr. 299.)  Plaintiff also attended a cardiac rehabilitation and risk reduction program for twelve weeks from August 31, 2009 until October 7, 2009.  (Tr. 181-192, 194-98, 205-10, 216-19, 236-47, 369.)  Plaintiff was expected to

attend a one hour class three times a week for twelve weeks. (Tr. 369.)

> b. *Dr. Steven Siskind, M.D., Internist with Cardiology Specialty*

Dr. Steven Siskind, an internist with a specialty in cardiology, oversaw and treated plaintiff from August 14, 2009 to January 1, 2012. Dr. Siskind treated plaintiff once every three months. (Tr. 388; 417; 448.)

Medical records from August 14, 2009 through January 1, 2012 intermittently show symptoms of stress, chest pain, shortness of breath, and fatigue resulting in early termination of plaintiff's exercise stress test. (Tr. 413; 431; 452; 463.) The records otherwise show stable vital signs, regular heart function with no murmur, rub, or gallop. (Tr. 374; 406.) Dr. Siskind administered an exercise stress test on August 21, 2009, and indicated that plaintiff's exercise test was stopped after six minutes due to plaintiff's fatigue and failure to achieve 85% of a predicted heart rate. (Tr. 358, 462.) According to the report, there was no ECG evidence of myocardial ischemia, or a condition of insufficient blood flow to the heart muscle, however the report noted that the sensitivity of the study for detecting ischemia is limited. Plaintiff also tested negative for angina. (Tr. 358.)

On November 30, 2009, Dr. Siskind diagnosed plaintiff with post myocardial infarction with anterior wall ischemia, high cholesterol, and kidney stones, and noted that plaintiff had no high blood pressure, rheumatic fever, stroke, diabetes, tuberculosis, hepatitis, ulcers, gallstones, thyroid disease, or cancer. (Tr. 367.) He noted that plaintiff had received a LAD stent upon complaints of chest pain, and that plaintiff was stable on all his medications. (Tr. 356.) He reported a stress test, in which plaintiff exercised six minutes without ischemia at 80% of a predicted maximum. (*Id.*) Dr. Siskind stated that his impression of plaintiff was that plaintiff had myocardial infarction with anterior wall ischemia,[2] LAD stent, and was presently stable while on medication. (*Id.*)

On August 4, 2010, Dr. Siskind evaluated plaintiff and reported abnormal results in plaintiff's stress test. (Tr. 413-14.) Dr. Siskind also reported that plaintiff's functional capacity was within normal limits, and that post-stress and resting myocardial scintigrams revealed a medium size, moderate intensity, predominantly fixed perfusion defect[3] involving the

---

[2] Ischemia is defined as a lack of blood supply to a part of the body, which may cause tissue damage due to lack of oxygen and nutrients. *Ischemia*, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0023204/. Infarct refers to an area of tissue death, due to a local lack of oxygen. *Definition of Infarction*, Medicine Net, http://www.medicinenet.com/script/main/art.asp?articlekey=3970.
[3] Perfusion defects refer to small areas of the heart that have diminished blood flow under stress. *Perfusion*, The Free Dictionary, http://medical-dictionary.thefreedictionary.com/perfusion.

left ventricular interior and inferolateral walls. (Tr. 413.)
Dr. Siskind noted that this was consistent with a moderate
degree of scarring with moderate peri-infarct ischemia of the
inferior and inferolateral walls. (Tr. 413.)

Dr. Siskind completed a Cardiac Impairment
Questionnaire on October 12, 2010, diagnosing New York Heart
Association Class II-III heart failure.[4] (Tr. 417.) Dr. Siskind
listed clinical findings and primary symptoms of dyspnea on
exertion, shortness of breath, fatigue, and weakness. (Tr.
417.) Dr. Siskind noted that these symptoms were precipitated
by emotional stress, physical exertion, and cold weather. (Tr.
419-20.) Dr. Siskind opined that plaintiff can only sit for two
hours per day and stand/walk for two hours per day when placed
in a competitive five day a week work situation. (Tr. 419-20.)
He further noted that plaintiff could never lift or carry, and
that pain, fatigue, and other symptoms were severe enough to
periodically interfere with plaintiff's attention and
concentration, and that plaintiff was incapable of tolerating
low work stress. (*Id.*) Dr. Siskind reported that plaintiff was

---

[4] According to the New York Heart Association Functional Classification, Class
II heart failure indicates patients with a "slight limitation of physical
activity" who are "comfortable at rest" and show "ordinary results in
fatigue, palpitation, [and] dyspnea (shortness of breath)." Class III heart
failure indicates patients with a "marked limitation of physical activity"
that are "comfortable at rest" and show "less than ordinary activity causes
fatigue, palpitation, or dyspnea." *Classes of Heart Failure*, American Heart
Association, available at
http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Class
es-of-Heart-Failure_UCM_306328_Article.jsp.

prescribed Toprol-XL, Cozaar, Plavix, ASA, and Lipitor.  (Tr. 419.)

On March 2, 2011, Dr. Siskind conducted a magnetic resonance angiography and diagnosed infra renal abdominal aortic aneurysm, ectasia of both common iliac arteries, moderate left external iliac artery stenosis, multiple severe stenosis and short segment occlusions of the left anterior tibial artery, and three vessel contiguous run off in the right lower leg with anterior tibial artery stenosis.  (Tr. 456-58; Plaintiff's Memorandum of Law in Support of Judgment on the Pleadings ("Pl. Mem.") at 4-5.)

Additional medical records from Dr. Siskind were submitted to the Appeals Council, consisting of charts, notes, and tests from August 14, 2009 to January 1, 2012, which do not depart significantly from the ones submitted for the ALJ hearing.

> c.  *Dr. Daniel N. Blum, M.D., Primary Care Physician*

Dr. Blum, a primary care physician, treated plaintiff, upon referral from Dr. Siskind, between August 4, 2010 and November 15, 2010.  (Tr. 356, 423.)  On August 5, 2009, Dr. Blum administered a Nuclear Exercise Stress Test which revealed abnormal stress, consistent with a moderate degree of peri-infarct ischemia of the interior and inferolateral walls, normal

functional capacity, normal overall left ventricular functions, normal exercise electrocardiography, and no angina. (Tr. 424.) Dr. Blum reported, however, that the stress test was stopped due to plaintiff's fatigue. (Tr. 424.) Dr. Blum also reported that plaintiff presented dyspnea, or shortness of breath, during physical exertion and stress, as well as lower extremity discomfort with ambulation. (Tr. 421.)

> d. *Dr. Azariah Eshkenazi, M.D., Psychiatrist*

On June 30, 2011, Dr. Eshkenazi conducted a psychiatric examination on plaintiff, the report of which was presented to the Appeals Council as additional evidence. (Tr. 511.) In his psychiatric report, Dr. Eshkenazi concluded with a reasonable degree of medical certainty that the plaintiff was not able to be gainfully employed due to plaintiff's severe generalized anxiety, dysthymic disorder, Heart Problems (Shortness of Breath), and Global Assessment of Function (GAF) level of 50-55, according to the DSM-IV Multiaxial Evaluation. (Tr. 514-15.)

Specifically, Dr. Eshkenazi observed that plaintiff suffers from severe depression, has difficulty focusing and concentrating, difficulty recalling memories, and would forget what he was about to say in the middle of a sentence. (Tr. 513-14.) Dr. Eshkenazi noted that plaintiff's affect was constricted and that he showed signs of anxiety. (*Id.*) The

doctor noted, however, that plaintiff has no visual or auditory hallucinations, has good judgment and insight, and is able to manage his funds. (Tr. 514.) Dr. Eshkenazi estimated that the earliest date which the observed symptoms and limitations apply is July 2009. (Tr. 522.)

Dr. Eshkenazi also completed a Psychiatric/Psychological Impairment Questionnaire on June 30, 2011, in which he indicated that plaintiff had a Global Assessment of Functioning ("GAF") score of 50 to 55, which indicates "[m]oderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) *or* moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Global Assessment of Functioning*, New York Office of Mental Health, https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment _functioning.pdf. He also reported clinical findings of poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty concentrating, complete social withdrawal or isolation, decreased energy, and generalized persistent anxiety. (Tr. 516.) Dr. Eshkenazi opined that plaintiff was markedly limited, or effectively precluded from, certain work related activities, including the ability to

12

remember locations and work-like procedures, understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and other activities required in a work-place environment. (Tr. 518-520.)

Dr. Eshkenazi also noted that plaintiff's psychiatric condition exacerbated his physical symptoms and opined that plaintiff was incapable of tolerating even low work stress. (Tr. 521.) He opined that plaintiff's days would vary, and the he would need to be absent from work on average more than three times per month due to either his impairments or treatment. (Tr. 522.)

### 2. Consultative Medical Sources

#### a. *Dr. Vinod Thukral*

Dr. Vinod Thukral conducted a consultative examination on November 14, 2009 and opined that the claimant is "limited from lifting, carrying, and other such activities requiring moderate or greater exertion due to angina." (Tr. 375.) Dr. Thukral noted that plaintiff complained of chest pain, heart attack, and shortness of breath, and denied any history of high blood pressure, diabetes, asthma, emphysema, or seizures. (Tr. 372.) Dr. Thukral also noted that plaintiff reported smoking two packs per day since 1967, but quit smoking in 2009 after his heart attack. Plaintiff also denied any alcohol or drug abuse. (Tr. 372.) Dr. Thukral noted that plaintiff appeared to be in

no acute distress, could walk on his heels and toes without difficulty, and was able to rise from the chair without difficulty. (Tr. 373.) Dr. Thukral did not find any abnormalities with respect to plaintiff's abdomen, bowel functioning, musculoskeletal functioning, or hand and finger dexterity. (Tr. 374.) Dr. Thukral diagnosed catheterization and two stent placements post heart attack, angina pectoris, and hypercholesterolemia since July 2009. (*Id.*) He concluded that plaintiff's prognosis was "fair" and that he had limitations with respect to lifting, carrying and other such activities that require moderate or greater exertion. (Tr. 375.)

      b.   *Dr. Mark Johnston, Internist*

      Dr. Mark Johnston conducted a consultative examination on November 8, 2010 and opined that "the claimant has a marked limitation of his ability to walk or climb secondary to shortness of breath." (Tr. 438.) Dr. Johnston noted that plaintiff complained of shortness of breath after walking or climbing stairs and discomfort in his left thigh while walking. (Tr. 435.) He also noted that plaintiff was hospitalized at New York Hospital for a heart attack in 2009, and two stents were placed in his coronary arteries. Although plaintiff was diagnosed with high blood pressure at that time, plaintiff denied any history of diabetes, other heart disease, asthma, emphysema, or seizures. (Tr. 435.) Dr. Johnston reported that

plaintiff was currently prescribed Plavix, Ramipril, Lipitor, Metoprolol, and Losartan. (*Id.*)

Dr. Johnston observed that plaintiff was not in acute distress, walked on heels and toes without difficulty, and was able to rise from chair without difficulty. (Tr. 436.) Plaintiff was diagnosed with shortness of breath "possibly secondary to myocardial infarction versus chronic obstructive pulmonary disease" and peripheral vascular disease. (Tr. 437.) Dr. Johnston noted normal test results with respect to his physical and neurologic functioning. (Tr. 436-37.)

In a Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Johnston opined that plaintiff could lift or carry up to ten pounds occasionally, and never more than ten pounds, sit for two hours without interruption, stand for thirty minutes without interruption, and walk for fifteen minutes without interruption in an eight hour work day. (Tr. 440.) He further opined that in an eight-hour workday, plaintiff could sit for four hours, stand for one minute, and walk for one minute in an eight hour work day. (*Id.*) Further, the doctor opined that "the individual is unable to work for eight hours because of shortness of breath and fatigue." (Tr. 440.) Dr. Johnston reported that plaintiff could never climb stairs, ramps, ladders or scaffolds and could occasionally balance, stoop, kneel, crouch, and crawl. He also

noted that plaintiff had occasional environmental limitations
with respect to working under conditions involving unprotected
heights, moving mechanical parts, operating a motor vehicle,
humidity and wetness, dust, odors, fumes, and pulmonary
irritants, extreme cold and heat, vibrations and could work with
moderate noise in an office setting.  (Tr. 443.)  Although Dr.
Johnston reported no physical impairments with respect to
travel, using public transportation, shopping, climbing a few
steps, preparing meals, caring for personal hygiene and sorting
or handling paper files, he noted that plaintiff was unable to
walk a block at a reasonable pace on rough or uneven surfaces.
(Tr. 444.)

> c. *Dr. T. Cotman, Disability Determination*
>    *Services Analyst*

Dr. T. Cotman, a Disability Determination Services
("DDS") analyst examined plaintiff and completed a Physical
Residual Functional Capacity Assessment on December 15, 2009.
(Tr. 377.)  Dr. Cotman determined that plaintiff could sit for
about 5 hours in an eight-hour workday, stand and/or walk for
total of 6 hours in an eight-hour workday, lift and/or carry
twenty pounds occasionally and ten pounds frequently.  (Tr.
377.)  Dr. Cotman reported that plaintiff has unlimited capacity
to push and/or pull except as shown for lifting and/or carrying.
(Tr. 377.)  Dr. Cotman opined that plaintiff has occasional

limitations climbing, stooping, kneeling, crouching, and crawling, and no limitations with respect to manipulative functioning, visual functioning, communication, or environmental factors, except that plaintiff should avoid concentrated exposure to hazards. (Tr. 378-79.) Dr. Cotman's assessment also found credible that the plaintiff faces functional limitation from shortness of breath, resulting in limitations in walking. (Tr. 379.)

    3.   <u>Other Documentary Sources</u>

        a.   *Plaintiff's Disability Report*

Plaintiff indicated in his disability insurance benefits application that he is disabled due to heart attack, high blood pressure, two stents, high cholesterol, shortness of breath, and carpal tunnel syndrome. (Tr. 129.) In his function report, plaintiff described the pain as to be "stabbing" in the middle of his chest, and that the pain is not continuous. (Tr. 146-47.) Plaintiff contended that he cannot climb stairs due to shortness of breath and is able to walk three blocks before having to stop and rest for five minutes. (Tr. 144.) Stress or change in his schedule causes plaintiff to be worried. (Tr. 145.)

Plaintiff further reported that he is unable to lift anything heavy, unable to climb stairs due to shortness of breath, and experiences dizziness occasionally. (Tr. 129.)

Plaintiff reported that he takes Ecotin to thin his blood, Lipitor to lower his cholesterol, Metoprolol for his heart condition, and Plavix as a blood thinner. (Tr. 134.) Plaintiff also reported taking Altrace, which treats high blood pressure. (Tr. 134.)

In his disability report, plaintiff reported symptoms of heart attack, high blood pressure, two stent placements, high cholesterol, shortness of breath, and carpal tunnel syndrome limit his ability to work. (Tr. 129.) Plaintiff received a cardiac catheterization on July 26, 2009. (*Id.*) Plaintiff stated that he is unable to lift, run up the stairs, has a slow pace of walking, and dizziness. (Tr. 129.) Plaintiff reported that he has been treated by Steven Siskind, M.D. for pain and takes medication for his heart problems and high cholesterol, including Plavix, Metoprolol, Lipitor, and Ramipril. (Tr. 146-47.)

b. *Disability Report - Field Office Interview*

Mr. Ng, a field officer for Social Security, conducted a face-to-face interview with plaintiff on September 17, 2009 and subsequently completed a disability report. (Tr. 125.) Mr. Ng noted that plaintiff had no difficulty in breathing, concentrating, sitting, standing, walking, or using his hands. (Tr. 126.) He observed that plaintiff was very organized, but looked very physically tired. (Tr. 127.)

**B.    Administrative Hearing Testimony**

ALJ Pecoraro held a hearing on January 25, 2011 to determine whether plaintiff was disabled within the meaning of the Social Security Act.  (Tr. 21, 38-59.)  At the hearing, plaintiff was represented by Nicole J. Kim, Esq., of Binder and Binder.  (Tr. 21, 37.)

1.    Plaintiff's Testimony

At the hearing, plaintiff testified that he was fifty-nine years old and completed one year of college.  (Tr. 42.)  He testified that he stopped working on February 28, 2009 because he was laid off from his accounting position at Standard Motor Products due to downsizing.  (Tr. 43.)  He noted that he received a severance package for one year and that his former employer would be paying his medical insurance for five years. (Tr. 44.)

Plaintiff testified that he began receiving unemployment insurance benefits since March 2009.  (Tr. 44.) Plaintiff also testified that he "made a little lie up" to the unemployment insurance in reporting that he is "willing and able to work," because he was concerned about financially supporting four people, his wife, daughter, grandson, and himself.  (Tr. 44.)  Plaintiff testified that he did not seek new employment because he was unable to concentrate and that he is unable to "even sit down and read a book."  (Tr. 46.)

Plaintiff testified that he experienced stress, shortness of breath, and chest pains, which began right after the heart attack and occurs once in three months when he is aggravated, upset, or worried about paying bills to support his family. (Tr. 53, 48.) He also reported having pain in his leg. (Tr. 48.) He testified to having no problems sitting or standing, other than having a hard time walking due to breathing and pain in his leg. (Tr. 51.) Plaintiff also noted that the doctor recommended taking long walks due to 'blocked artery' in the leg. (Tr. 51.) Plaintiff testified that he was taking Cozaar, Zetia, and Ecotrin for his symptoms, and discontinued Ramipril due to the negative side effects. (Tr. 48.)

Plaintiff testified that on a typical day, he sits in the living room, either watching television or listening to music. (Tr. 48.) He cooks for himself and his daughter, who does the shopping and laundry. (Tr. 49.) He noted that his daughter takes care of him in New York, while his wife takes care of their grandson in Atlanta, Georgia. (Tr. 49.) Plaintiff indicated that he did not have a driver's license, and takes the bus, but avoids the train to avoid climbing stairs. (*Id.*) Plaintiff also testified that he takes a long walk each morning that is approximately a one mile loop, but that he has to stop and catch his breath after every block and has had more difficulty due to the pain in his leg. (Tr. 50-51.) He noted

that he has to stop for at least two minutes before resuming. (Tr. 52.)  Plaintiff indicated that he can lift a gallon of milk, but not more.  (Tr. 52.)

Plaintiff also reports having trouble sleeping at night being unable to sleep and feeling tired during the day due to all the medication he is taking.  (Tr. 51.)  Plaintiff had been smoking for forty years but testified to quitting since the heart attack.  (Tr. 54.)  Plaintiff also mentioned weight gain from 130 pounds to 165 pounds.  (Tr. 54.)

2.    Expert Testimony of Dr. Richard J. Wagman, M.D.

Dr. Richard Wagman, a specialist in cardiology, testified as a non-examining consultative medical expert.  (Tr. 453.)  Dr. Wagman reported that plaintiff received a cardiac catheterization, which showed primarily that one vessel, the left anterior descending, was 90 percent obstructed, and that plaintiff had an angioplasty with a stent.  (Tr. 56.)  He further noted that in 2008, a CAT scan revealed an aortic aneurysm which was consistent with vascular and cardiac disease. (Tr. 56.)   Dr. Wagman discussed records of abdominal aortic aneurysm on January 26, 2008, and observed that a stress test result on August 21, 2009 was negative for ischemia, but was less than predicted maximum [heart rate].  (*See* Tr. 404.)  He mentioned that the plaintiff could not complete the test due to fatigue.  (Tr. 56.)

Dr. Wagman testified that his opinion is that plaintiff has no limitations standing or sitting. (Tr. 57.) However, plaintiff's ability to lift or carry is limited due to his aortic aneurysm, and thus, plaintiff should lift or carry only occasionally, up to a maximum of 10 lbs. (Tr. 58.) Dr. Wagman also testified regarding his belief that plaintiff's biggest problem with respect to walking is that it causes pain and stress in his left lower leg, due to claudication, a condition in which camping in the leg is induced by exercise, typically caused by obstruction of the arteries. (Tr. 56.) *See Claudication,* Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/claudication/basics/definition/con-20033581. Dr. Wagman concluded that "walking is very stressful because it causes pain" and "even with sedentary work, [plaintiff] would have problems because of this, just getting from A to B, even short distances, he would have pain and would be forced to stop." (Tr. 56.)

## DISCUSSION

Plaintiff argues that the ALJ's decision is flawed because the ALJ: (1) failed to properly weigh the medical opinions because she did not afford controlling weight to plaintiff's treating sources; (2) failed to provide "good reasons" for affording less than controlling weight to plaintiff's treating sources; and (3) erred in her determination

of plaintiff's credibility.  Alternatively, plaintiff argues, new and material evidence before the Appeals Council warrants remand.

Defendant argues that the ALJ correctly evaluated the medical opinions, properly assessed plaintiff's subjective symptomatology, properly assessed plaintiff's credibility, and correctly determined that plaintiff was not disabled because he has the RFC to perform his past relevant work.  (ECF No. 13, Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings ("Def. Mem.") at 11-17].)  Defendant also contends that the evidence submitted to the Appeals Council is not material and does not warrant remand.  (Def. Mem. at 18-19.)

## I.    Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the

decision.  *See Schaal v. Apfel,* 134 F.3d 496, 504 (2d Cir. 1998).

A district court may set aside the Commissioner's decision only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "Substantial evidence is 'more than a mere scintilla,'" and must be relevant evidence that a reasonable mind would accept as adequate to support a conclusion.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (citing *Richardson v. Perales*, 420 U.S. 389, 401 (1971)).  If there is substantial evidence in the record to support the Commissioner's factual findings, those findings must be upheld.  42 U.S.C. §405(g).  Inquiry into legal error "requires the court to ask whether 'the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act.'"  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

The reviewing court does not have the authority to conduct a *de novo* review, and may not substitute its own judgment for that of the ALJ, even when it might have justifiably reached a different result.  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).

**II.  The Commissioner's Five-Step Analysis of Disability Claims**

To receive disability benefits, claimants must be "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(a), (d).  A claimant is disabled under the Act when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000).  The impairment must be of "such severity" that the claimant is unable to do his previous work or engage in any other kind of substantial gainful work.  42 US.C. § 423(d)(2)(A).

"The Commissioner must consider the following in determining a claimant's entitle to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability. . .; and (4) the claimant's educational background, age, and work experience.'"  *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999)) (internal citation omitted).

The SSA has promulgated a five-step sequential analysis to determine whether a claimant's condition meets the definition of disability: if the commissioner determines (1) that the claimant is not working, (2) that he or she has a

severe impairment, (3) that the impairment is not one listed in the Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find the claimant disabled if (5) there is not another type of work that claimant can do. *Burgess*, 547 F.3d at 120; 20 C.F.R. § 404.152(a)(4). At any of the previously mentioned steps, if the answer is "no," then the analysis stops and the ALJ must find claimant not disabled under the Act.

During this five-step process, the Commissioner must "consider the combined effect of any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits." 20 C.F.R. § 404.1523. Further, if the Commissioner does find a combination of impairments, the combined impact of the impairments, including those that are not severe as defined in the regulations, will be considered in the determination process. 20 C.F.R. § 416.945(a)(2). In steps one through four of the sequential five-step framework, the claimant bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128. In step five, the burden shifts from the claimant to the Commissioner, requiring that the Commissioner show that, in light of the claimant's RFC, age, education, and work experience, the claimant is "able to engage in gainful

employment within the national economy." *Sobolewski v. Apfel*,
985 F. Supp. 300, 310 (E.D.N.Y. 1997).

## III. The ALJ's Disability Determination

The ALJ first found that claimant met the insured
status requirements of the SSA through December 31, 2013.  (Tr.
23.)  Using the five-step sequential process to determine
whether a claimant is disabled as mandated by 20 C.F.R.
§ 404.1520(a)(4), the ALJ determined at step one that the
plaintiff had not engaged in substantial gainful activity since
the alleged onset date July 26, 2009.  (Tr. 23.)

At step two, the ALJ found that the plaintiff suffered
from the severe impairments of aortic aneurysm and
cardiovascular disease (status post angioplasty with stent
placement).  (Tr. 23.)  At step three, the ALJ determined that
the plaintiff did not have an impairment or combination that
meets or medically equals one of the listed impairments in
Appendix 1 of the regulations 20 C.F.R. § 404.1520, Appendix 1,
Subpart P, Regulations No. 4.  In support of this determination,
the ALJ relied on the testimony of the medical expert, Dr.
Wagman, who has a specialty in cardiology and "testified that
the claimant's impairments do not meet or equal the listing of
impairments."  (Tr. 24.)  The ALJ gave "great weight" to Dr.
Wagman because he is "duly qualified and specializes in

27

cardiology and is familiar with the disability process." (Tr. 24.)

Before proceeding to steps four and five, the ALJ evaluated the entire record, and found that the plaintiff has the residual functional capacity ("RFC") to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (Tr. 24.) The ALJ further determined that "the claimant is capable of lifting/carrying and pushing/pulling ten pounds occasionally and less than ten pounds frequently. He is able to sit for six hours total and stand/walk for two hours total in an eight-hour workday. Furthermore, there are no postural, environmental, manipulative, or mental restrictions." (Tr. 24.) In support of her determination, the ALJ considered plaintiff's self-reports, which indicated plaintiff's belief that his conditions prevented him from lifting, climbing, and forces him to walk slowly, experiencing dizziness, and ambulation difficulty due to lower left extremity. (Tr. 25.) The ALJ also reviewed and considered the medical records and physician's opinions, which the ALJ found supported a finding that plaintiff is limited to sedentary physical exertion.

At step four of the analysis, after determining that the plaintiff had an RFC to perform the full range of "sedentary work," the ALJ concluded that plaintiff was able to perform his past work as a book keeper (DOT 210.382-014) which typically

28

requires sedentary physical exertion. (Tr. 30.) Thus, the ALJ concluded that the plaintiff has not been disabled within the meaning of the Social Security Act from July 26, 2009 to April 18, 2011, and denied the plaintiff's SSI claim. (Tr. 30.) Because the ALJ found that plaintiff was able to perform his past relevant work, she did not, and was not required to, proceed to step five of the disability analysis.

## IV. Analysis

### A. The ALJ's Evaluation of the Opinion of Plaintiff's Treating Physician

Plaintiff argues that the ALJ erred by affording less than controlling weight to Dr. Siskind's opinion, when Dr. Siskind was plaintiff's treating physician. (Pl. Mem. at 10-14.) Moreover, plaintiff argues that the ALJ failed to provide "good reasons" for selectively adopting the opinions of medical consultants and not adopting the opinions of plaintiff's treating physicians by failing to weigh the factors established in 20 C.F.R § 404.1527(c)(2)-(6). (*Id.* at 14.)

"Regardless of its source," the regulations require that "every medical opinion" in the administrative record be evaluated when determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1527(c), 416.927(c). *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182 (E.D.N.Y. 2011). "Acceptable medical sources" that can provide evidence to establish

impairment includes the plaintiff's licensed treating physicians and licensed or certified treating psychologists. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a). *Hernandez*, 814 F. Supp. 2d at 182. Under the "treating physician rule," the medical opinion of the physician engaged in the primary treatment of a claimant is given controlling weight if it is well-supported by the acceptable medical, clinical, and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2)(2011), 416.927(d)(2)(2011); *Shaw v. Charter*, 221 F.3d 126, 134 (2d Cir. 2000) (describing "treating physician rule"). According to the Commissioner's regulations, the opinions of treating physicians deserve controlling weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Balodis*, 704 F. Supp. at 264 (quotations omitted) (citing 20 C.F.R. §§ 404.1527(d)(2)(2011), 416.927(d)(2)(2011)).

Where a treating physician's opinion on the nature and severity of a claimant's disability is not afforded "controlling" weight, the ALJ must also give "good reasons" for the weight assigned to a treating physician's opinion. 20

C.F.R. § 404.1527(c)(2)(2011) (the SSA "will always give good reasons in [its] notice of determination or decision for the weight [given to the claimant's] treating source's opinion"); *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). Failure to provide "good reasons" for not crediting a treating source's opinion, even on issues that are determined by the Commissioner, is a ground for remand. *Sanders*, 506 F. App'x at 77 (citing *Schaal,* 134 F.3d at 505); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 507 (S.D.N.Y. 2014) (holding the ALJ's decision in the instant case erred by "failing to explicitly consider several required factors, including [the treating source's] specialty, and the frequency, length, nature, and extent of treatment"); *Balodis*, 704 F. Supp. 2d at 267 (remanding case for ALJ's failure to apply the treating physician rule because there was "no reference in the ALJ's decision to the various factors that must be considered in deciding what weight to give the opinion of a treating physician").

Although the regulations do not exhaustively define what constitutes "good reasons" for the weight given to a treating physician's opinion, the regulations provide the following enumerated factors that should guide an ALJ's determination when declining to afford controlling weight to a

treating physician on the issue of the nature and severity of a disability: (1) frequency of examination and length, nature, and extent of the treatment relationship; (2) evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion was from a specialist; (5) and any other relevant factors. 20 C.F.R. §§ 404.1527(c)(2)-(6)(2011), 416.927(c)(2)-(6)(2011); *see Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993)).

The SSA also considers opinions from treating physicians regarding the RFC and disability of a claimant, the final responsibility for determining whether a claimant is disabled is reserved to the Commissioner, not to physicians; therefore, the source of an opinion on those matters is not given "special significance" under the regulations. *Francois v. Astrue*, No. 09-CV-6625, 2010 WL 2506720, at *6 (S.D.N.Y. June 21, 2010) (citing 20 C.F.R. § 404.1527(e)(3) (2010)); *see also* 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").[5] In fact, "[t]he Commissioner is not required, nor even necessarily permitted, to

---

[5] 20 C.F.R. §§ 404.1527(e) (2012)and 416.927(e) (2012) were amended effective March 26, 2012, with the result that subsection (e) was re-designated as subsection (d), without substantive change. For consistency, the court will herein refer to 20 C.F.R. §§ 404.1527(d) and 416.927(d), currently in effect.

accept any single opinion, even that of a treating physician, as
dispositive on the determination of disability." *Francois*, 2010
WL 2506720, at *5 (citing *Green-Younger v. Barnhart*, 335 F.3d
99, 106 (2d Cir. 2003)).  The ALJ may not, however, "arbitrarily
substitute his own judgment for competent medical opinion."
*Cage*, 692 F.3d at 122.

> 1.  It was Improper For The ALJ to Afford Dr.
>     Siskind's Opinion Less Than Controlling Weight
>     Under the Treating Physician Rule

The record establishes that Dr. Siskind treated
plaintiff from July 26, 2009 through January 1, 2012, once every
three months for both examination and follow up.  (Tr. 358-60,
388-422; 448, 459-510.)  Accordingly, Dr. Siskind is plaintiff's
treating physician.  *See* 20 C.F.R. § 404.1502 ("A treating physician is
a claimant's "own physician, psychologist, or other acceptable
medical source who provides [claimant], or has provided
[claimant], with medical treatment or evaluation and who has, or
has had, an ongoing treatment relationship with [claimant].");
*Hernandez*, 814 F. Supp. 2d at 183 (holding that an ongoing
treatment relationship exists when the evidence demonstrates
that the claimant has seen the physician "with a frequency
consistent with accepted medical practice for the type of
treatment and/or evaluation required for claimant's medical
conditions") (internal quotations omitted).

The ALJ afforded "limited weight" to Dr. Siskind's opinion that plaintiff is capable of sitting only two hours total in an eight-hour workday and incapable of even low stress because there was no "objective support" in the record. (Tr. 27.) This was significant because the inability to sit for prolonged periods impacts the ability to perform sedentary work. *See Niles v. Astrue*, 32 F. Supp. 3d 273, 286 (N.D.N.Y. 2012); *see also Perez v. Chater*, 77 F.3d 41, 46 (2d. Cir. 1996) ("Sedentary work . . . generally involves up to . . . six hours of sitting in an eight-hour workday."). The ALJ noted that the record supported Dr. Siskind's finding that plaintiff was significantly limited in his ability to stand and walk for prolonged periods, however, the record was devoid of any "sufficiently abnormal clinical findings to support finding him incapable of sitting" and two consultative examinations "show grossly normal musculoskeletal findings." (*Id.*) Moreover, the ALJ relied on plaintiff's own testimony that he had no problems sitting. (*Id.*) The ALJ thus gave "considerable weight" to the opinions of consultative examiners Dr. Thukral, who found that plaintiff was unable to engage in activity that required moderate or greater exertion, and Dr. Johnston, who opined that plaintiff was markedly limited in walking and climbing, but was able to sit for four hours in an eight-hour workday, and sit for two hours continuously. (Tr. 28.)

First, the ALJ improperly substituted Dr. Siskind's opinion with her own when she determined that "absent musculoskeletal evidence," Dr. Siskind's finding that plaintiff incapable of prolonged sitting is unsupported. (Tr. 27.) *See Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (noting that ALJ improperly substituted his own lay interpretation of medical diagnostic test for the uncontradicted opinion of claimant's treating physician); *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)) (finding that ALJ had improperly made a medical determination by concluding that an absence of "atrophy of any muscle groups" was inconsistent with a finding of disability)); *Lester v. Comm'r of Soc. Sec.*, No. 13-CV-531, 2014 WL 4771860, at *9 (N.D.N.Y. Sept. 24, 2014) (finding that ALJ improperly substituted his opinion when finding that plaintiff was not limited in his ability to sit upon a finding that plaintiff did not suffer from muscle spasms that would hinder sitting).

Moreover, it was improper for the ALJ to rely on the opinions of consultative examiners Dr. Thukral and Dr. Johnston in discounting Dr. Siskind's opinion that plaintiff can only sit for two hours per workday. The "ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the treating physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject

the opinion of the treating physician." *Donnelly v. Comm'r of Soc. Sec.*, 49 F. Supp. 3d 289, 305 (E.D.N.Y. 2014) (citing *Moore v. Astrue,* 07–CV–5207, 2009 WL 2581718, at *10 n.22 (E.D.N.Y. Aug. 21, 2009)) (alterations in original). "[C]onsultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Hernandez*, 814 F. Supp. 2d at 182-83 (quoting *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584 at *9). Indeed, "[t]he Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" *Harris v. Astrue,* 07–CV–4554, 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) (quoting *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir. 1990)).

Moreover, Dr. Thukral conducted a physical examination of plaintiff and stated that "claimant is limited from lifting, carrying, and other such activities requirement moderate or greater exertion due to angina." (Tr. 375.) This opinion is too vague to provide substantial evidence to counteract the opinion of Dr. Siskind. *See Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir. 2000) (noting that physician's opinion that claimant's "impairment [was]: [l]ifting and carrying moderate; standing and walking, pushing and pulling and sitting mild" was "so vague as

36

to render it useless in evaluating whether [claimant could] perform sedentary work."); *Barillaro v. Comm'r of Soc. Sec.*, 216 F. Supp. 2d 121, 130 (E.D.N.Y. 2002) (finding that ALJ erred in affording less than controlling weight to treating physician because ALJ relied on inconsistent medical reports that were neither substantial nor compelling). Thus, it was improper to afford controlling weight to Dr. Thukral's opinion and to afford limited weight to Dr. Siskind's opinion based on its inconsistency with Dr. Thukral's vague findings regarding plaintiff's exertional capabilities.

Moreover, Dr. Siskind's opinion regarding plaintiff's ability to sit for less than two hours is supported by other medical opinions in the record. Dr. Wagman and Dr. Johnston both opined that plaintiff was limited in performing even sedentary work, due to fatigue and pain. Indeed, although Dr. Wagman testified that plaintiff was not limited in his ability to sit for prolonged periods, he also Dr. Wagman testified that "the biggest thing that would, I think be a problem with him because he does have a normal ejection fraction, but walking is very stressful because it causes pain. And I believe that even with sedentary work, he would problems because of this, just getting from A to B, even short distances he would have pain and he would be forced to stop. And this is really what the record shows." (Tr. 56.)

Dr. Johnston's opinion that plaintiff was limited in his ability to sit for more than two hours continuously, or four hours total, was also consistent with Dr. Siskind's, however, the ALJ afforded Dr. Johnston's opinion regarding plaintiff's ability to sit "limited weight," noting that Dr. Johnston "relie[d] too heavily on the claimant's self-reports." (Tr. 28.) Dr. Siskind's and Dr. Johnston's reliance on the claimant's self-reports of fatigue does not undermine their opinions as to plaintiff's limitations. (Tr. 27.) Such self-reported evidence constitutes medically acceptable clinical and laboratory diagnostic technique, and should be considered in a medical examiner's assessment of a claimant. *Green–Younger,* 335 F.3d at 107 (noting that medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool."). Accordingly, the court finds that it was improper to afford limited weight to Dr. Siskind's opinion regarding plaintiff's ability to sit on the basis that it was contradicted by the opinions of consultative examiners or that it relied on plaintiff's own statements regarding pain and fatigue.

Furthermore, the ALJ erred by discounting Dr. Siskind's medical opinion because it was inconsistent with the plaintiff's testimony regarding his ability to perform daily

activities. *Valet v. Astrue*, No. 10-CV-3282, 2012 WL 194970, at
*19 (E.D.N.Y. Jan. 23, 2012) (finding that the ALJ's reasoning
for undermining a medical opinion is insufficient when the basis
for the ALJ's conclusion was that the medical opinion is
inconsistent with the "claimant's own testimony that she cooks,
cleans the house, walks to the store and walks her daughter 10
blocks to school" and "that she has no problem with personal
care, engages in social activities with her family, attends
church weekly, and cleans her house"). Here, the plaintiff's
capacity to participate in activities such as watching
television, listening to music, cooking dinner at times, and
taking walks as part of his physical therapy does not indicate
that he is capable of sedentary work. *Mackey v. Barnhart*, 306
F. Supp. 2d 337, 344 (E.D.N.Y. 2004). Nor does plaintiff's
testimony that he does not "have problems sitting," indicate
that he can sit for at least six hours continuously, that he is
able to sit for prolonged periods of time, or that he is able to
engage in the exertional requirements of a sedentary occupation.

Nevertheless, even if Dr. Siskind's opinion was
unclear, internally inconsistent, or in conflict with other
medical opinions in the record, the ALJ failed to fulfill her
duty to develop the administrative record by seeking additional
information from the treating physicians to clarify or resolve
such inconsistencies. Pursuant to the ALJ's duty to develop the

administrative record, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Burgess*, 537 F.3d at 129; *Rosa*, 168 F.3d at 79 (citing *Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte."); *see Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (holding that if asked for more information, the treating physician doctor might have been able to offer clinical findings in support of his conclusion that the plaintiff could not sit for most of the workday. The physician's "failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical."). The ALJ should have clarified or sought additional information from Dr. Siskind and Dr. Johnston with respect to plaintiff's ability to sit for extended durations, rather than affording limited weight to their opinions based on the presumption that the doctors over-relied on the self-reports of the claimant instead of on their clinical findings.

Thus, although the record does not permit the court to determine whether plaintiff is, in fact, entitled to disability benefits, in light of the foregoing errors, the court concludes

that the case must be remanded to the SSA so that plaintiff's claim can be considered with a proper application of the treating physician rule. If the ALJ declines to give controlling weight to Dr. Siskind's opinion as to the nature and severity of plaintiff's impairment, plaintiff is entitled to a comprehensive statement as to what weight is given and of good reasons for the ALJ's decision.

## B.    The ALJ's Credibility Determination

Plaintiff argues that the ALJ erred by: (1) applying an improper legal standard in her credibility determination by evaluating the consistency of plaintiff's statements with the ALJ's own RFC assessment instead of the evidence in the record; (2) failing to give proper weight to plaintiff's testimony regarding his subjective symptoms; and (3) failing to assess the factors set forth in the Regulations before making her credibility determination. (Pl. Mem. at 16-17.)

A claimant's statements of pain or other subjective symptoms cannot alone serve as conclusive evidence of disability. *Felix v. Astrue*, No. 11-CV-3697, 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012) (citing *Genier v. Astrue,* 606 F.3d 46, 49 (2d. Cir. 2010) (citing 20 C.F.R. § 1529(a)); *see Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010). If the plaintiff offers statements about pain or other symptoms not substantiated by the objective medical evidence, the ALJ is

required to engage in a credibility inquiry. *Felix*, 2012 WL 3043203, at *8 (citing *Meadors*, 370 F. App'x at 183 (summary order)).

The Commissioner has established a two-step process that an ALJ must follow in evaluating a claimant's credibility with regard to her assertions about pain and other symptoms and their impact on claimant's ability to work. *Felix,* 2012 WL 3043203, at *8 (citing *Genier*, 606 F.3d at 49); *Cabassa v. Astrue*, No. 11-CV-1449, 2012 WL 2202951, at *13 (E.D.N.Y. June 13, 2012); *Williams v. Astrue*, No. 09-CV-3997, 2010 WL 5126208 at *13 (E.D.N.Y. Dec. 9, 2010) (internal citation omitted). First, the ALJ must consider whether the claimant has a medically-determinable impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant. 20 C.F.R. §§ 404.1529(b), 416.929(b). Subjective assertions of pain alone cannot form the grounds for a finding of disability at this stage. *Genier*, 606 F.3d at 49.

Second, if the claimant does suffer from an impairment that could reasonably be expected to produce pain or the symptoms alleged, the ALJ must then "evaluate the intensity and persistence of the claimant's symptoms." 20 C.F.R. §§ 404.1529(c)(1), 416.020(c)(1). If the claimant's statements are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry. *Meadors*, 370 F. App'x at

183 (citing 20 C.F.R. § 404.1529(c)(3)). Plaintiff's credibility will be given considerable weight if her statement about pain is consistent with objective clinical evidence. *See* 20 C.F.R. § 404.1529(c)(4); *Kane v. Astrue*, 942 F. Supp. 2d 301, 313 (E.D.N.Y. 2013).

The ALJ, however, is not required to discuss all seven factors as long as the decision "includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasons for that weight." *Felix*, 2012 WL 3043203 at *8 (citing *Snyder v. Barnhart*, 323 F. Supp. 2d at 546-47 & n.5 (S.D.N.Y. 2004)). "Because an ALJ has the benefit of directly observing a claimant's demeanor and other indicia of credibility, his decision to discredit subjective testimony may not be disturbed on review if his disability determination is supported by substantial evidence." *Williams v. Astrue*, No. 09-CV-3997, 2010 WL 5126208 at *13 (E.D.N.Y. Dec. 9, 2010) (citing *Brown v. Astrue*, No. CV-08-3653, 2010 WL 2606477, at *6).

"An ALJ's finding that a witness lacks credibility must be 'set forth with sufficient specificity to permit intelligible plenary review of the record.'" *Morrison v. Astrue*, 08-CV-2048, 2010 U.S. Dist. LEXIS 115190, at *12 (E.D.N.Y. Oct. 27, 2010) (quoting *Williams*, 859 F.2d at 261); *see also Escalante v.* Astrue, No. 11 Civ. 375, 2012 U.S. Dist.

LEXIS 879, at *23 (S.D.N.Y. Jan. 4, 2012) ("Conclusory findings

of a lack of credibility will not suffice; rather, an ALJ's

decision 'must contain specific reasons for the finding on

credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave

to the individual's statements and the reasons for that

weight.'") (quoting Evaluation of Symptoms in Disability Claims:

Assessing the Credibility of an Individual's Statements, 61 Fed.

Reg. 34,483, 34,484 (July 2, 1996)).

    SSR 96-7p provides in pertinent part:

    It is not sufficient for the adjudicator to
    make a single, conclusory statement that "the
    individual's    allegations    have    been
    considered" or that "the allegations are (or
    are not) credible." It is also not enough for
    the adjudicator simply to recite the factors
    that are described in the regulations for
    evaluating symptoms. The determination or
    decision must contain specific reasons for the
    finding on credibility, supported by the
    evidence in the case record, and must be
    sufficiently specific to make clear to the
    individual and to any subsequent reviewers the
    weight the adjudicator gave to the
    individual's statements and the reasons for
    that weight.

SSR 96-7p, 1996 WL 374186, at *2. Absent such findings, remand

is required. *See Villani v. Barnhart*, No. 05-CV-5503, 2008 WL

2001879, at *11 (E.D.N.Y. May 8, 2008).

Here, the ALJ determined that the plaintiff's impairments "could reasonably be expected to cause the alleged symptoms" but the plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms are not credible "to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 29.)

The court respectfully finds that the ALJ's credibility analysis is insufficient. As an initial matter, it was improper for the ALJ to conclude that plaintiff's statements regarding the intensity, persistence, and limiting effects of his alleged symptoms were "not credible to the extent they are inconsistent with the . . . *residual functional capacity assessment.*" (Tr. 29 (emphasis added).) Indeed, "it was counterintuitive to reject [plaintiff's] physical symptoms simply because they were at odds with the ALJ's RFC assessment; rather, they [should have been] assessed *in order to determine* [his] RFC." *Stuart v. Colvin*, No. 13-CV-04552, 2014 WL 4954487, at *13 (E.D.N.Y. Sept. 30, 2014) (citing *Jackson v. Astrue,* No. 09-CV-1290, 2010 WL 3777732, at *5 (E.D.N.Y. Sept. 21, 2010) (emphasis in original).

Moreover, although it was within the ALJ's discretion to make a final decision that plaintiff was not "entirely credible," the ALJ failed to make specific findings explaining her credibility determinations based on specific evidence to

enable effective review.  The ALJ failed to state which of plaintiff's statements, if any, she found to be credible or not credible, the weight given to plaintiff's statements, and the reasons for affording such weight.  *See* SSR 96-7p; *Villani*, 2008 WL 2001879, at *11 (remanding for determination of plaintiff's credibility, which must contain specific findings based upon substantial evidence in a manner that enables effective review).  The ALJ considered some of the factors set forth in the Regulations, 20 C.F.R. § 404.1529(c)(3)(i)-(vii), including plaintiff's daily activities, the location, duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, and the effectiveness and side effects of plaintiff's medications.  (Tr. 29-30.) The ALJ's analysis, however, was insufficient because the ALJ failed to adequately detail the bases for her credibility determination or "identify what facts [s]he found to be significant, [or] indicate how [s]he balanced the various factors." *Kane*, 942 F. Supp. 2d at 314 (citing *Simone v. Astrue*, No. 08-CV-4884, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009)); *Williams*, 2010 WL 5126208, at *20 (internal citation omitted).  Instead, the ALJ merely summarized the plaintiff's self-reports and testimony regarding his ability to engage in sustained activity, without evaluating its consistency with the evidence in the record.  The ALJ also reiterated plaintiff's testimony that he experiences shortness

of breath and chest pains every three months due to worry and anxiety without assigning any weight to these statements or evaluating them in the context of the medical record. (Tr. 29.) Only once did the ALJ specifically discredit plaintiff's statement with regard to his allegations of fatigue, which the ALJ found was not corroborated by the record. (Tr. 29.)

The opinion notes that plaintiff "described his typical day as sitting and watching television," that plaintiff "reported being able to cook for himself and daughter" is "able to use public transportation . . . lives in a three-story walk up apartment . . . [and] goes on daily, one-mile walks with periodic breaks," (Tr. 29), but does not assess whether these activities contradict other evidence from the record. Indeed, the "Second Circuit has held that an individual who engages in activities of daily living, especially when these activities are not engaged in 'for sustained periods comparable to those required to hold a sedentary job,' may still be found to be disabled." *Kaplan v. Barnhart*, No. 01-CV-8438, 2004 WL 528440, at *3 (E.D.N.Y. Feb. 24, 2004) (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)). "That the plaintiff . . . can cook daily, perform routine household chores once a week, go shopping . . . does not, without more, necessarily contradict [his] claim that [he] experiences pain when walking or sitting for more than 30 minutes." *Larsen v. Astrue*, No. 12-CV-414, 2013 WL 3759781,

at *3 (E.D.N.Y. July 15, 2014). Without "further clarifications as to the nature of these activities," such daily activities cannot "undermine the plaintiff's allegations concerning her pain." *Id.*

The ALJ concluded the "overall record shows that [plaintiff's] condition is stable and [that he] has no musculoskeletal abnormalities to justify a limited ability to sit for prolonged periods of time." The ALJ failed to address plaintiff's allegations with respect to his shortness of breath during physical exertion, his chest pains, or his fatigue. The ALJ cannot "simply selectively choose evidence in the record that supports [her] conclusions" and must give specific reasons indicating why she found certain doctor appointments and medical opinions more significant than others when assessing plaintiff's credibility. *Cabassa*, 2012 WL 2202951, at *15 (citing *Gecevic v. Sec'y of Health and Human Servs*, 882 F. Supp. 278, 286 (E.D.N.Y. 1995)).

Finally, plaintiff argues that the ALJ erroneously relied on plaintiff's receipt of unemployment benefits and his statements that he is "ready, willing, and able to work," (Pl. Mem. at 18), however, courts in Second Circuit have held that an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that he was ready, willing, and able to work during the time period for which he

claims disability benefits as adverse factors in the ALJ's credibility determination." *Felix v. Astrue*, No. 11-CV-3697, 2012 WL 3043203, at *10 (E.D.N.Y. July 24, 2012). Thus the ALJ properly considered, but did not rely exclusively upon, plaintiff's willingness to work, noting that it did "not look favorably on his allegations of disability." (Tr. 29.) Accordingly, it was proper for the ALJ to consider evidence of the plaintiff's unemployment compensation and stated willingness to work in assessing plaintiff's credibility, and the plaintiff's motion for judgment on the pleadings is denied with respect to this ground. However, the ALJ's credibility determination must be "set forth with sufficient specificity to permit intelligible plenary review of the record." *Morrison*, 2010 U.S. Dist. LEXIS 115190, at *12 (internal quotation marks and citation omitted). Accordingly, the court remands this case for a determination of plaintiff's credibility, which shall contain the ALJ's specific findings in order to enable effective review.

**C.    New Evidence Submitted to the Appeals Council Warrants Remand**

Plaintiff argues that remand is warranted for the consideration of new, material evidence presented to the Appeals Council. Under 42 U.S.C. § 405(g), the court may remand a case "upon a showing that there is new evidence which is material and

that there is good cause for the failure to incorporate the evidence into the record in a prior proceedings." 42 U.S.C. § 405(g); *see Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988); *see also* 20 C.F.R. §§ 404.970. New and material evidence submitted after the ALJ's decision, shall be considered "only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); *Bailey v. Astrue*, 815 F. Supp. 2d 590, 599 (E.D.N.Y. 2011) (citing *Shalala v. Schaefer*, 509 U.S. 292, 297 (1993)); *Garcia v. Comm'r of Soc. Sec.*, 496 F. Supp. 2d 235, 242 (E.D.N.Y. 2007) (citing *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996)). In order for a court to remand a case and order additional evidence to be taken before the Commissioner, the evidence must satisfy three requirements. *Houston v Colvin*, No. 12-CV-03842, 2014 WL 4416679, at *8 (E.D.N.Y. Sept. 8, 2014) (citing *Tirado v. Bowen*, 842 F.2d 595, 567 (2d Cir. 1988)); *Flanigan v. Colvin*, 21 F. Supp. 3d 285, 307-08 (S.D.N.Y. 2014) (citing *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)). The evidence must be: (1) new; (2) material; and (3) there must be good cause for failing to present this evidence in earlier proceedings." *Houston*, 2014 WL 4416679, at *8; *Bailey*, 815 F.

Supp. 2d at 599-600 (citing *Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)).

Evidence is considered "new" when the evidence is not merely a cumulative account of what already exists in the record. *Houston*, 2014 WL 4416679, at *8 (internal citation omitted); *Bailey*, 815 F. Supp. 2d at 600 (internal citation omitted). To be material the evidence must be relevant to the plaintiff's condition during the alleged disability period and probative. *Pollard v. Halter*, 193 (2d Cir. 2004). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Pollard*, 377 F.3d at 193 (quoting *v. Bowen,* 842 F.2d 595, 597 (2d Cir. 1988)) (internal quotation marks omitted); *Houston*, 2014 WL 4416670, at *8 (quoting *Tirado*, 842 F.2d at 597 (2d Cir. 1988)). Good cause may be established by the non-existence of the evidence at the time of the hearing. *Pollard*, 377 F.3d at 193); *Patterson v. Colvin*, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014) (internal citation omitted); *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 341 (E.D.N.Y. 2010. Where "new evidence" is submitted to the Appeals Council and part of the administrative record for judicial review, however, a showing of good cause is not necessary where the evidence was presented to the Appeals Council, but the Appeals Council declined to consider it. *See*

*Knight v. Astrue,* 10-CV-5301, 2011 WL 4073603, at *12 (E.D.N.Y. Sept. 13, 2011) (citing *Perez,* 77 F.3d at 45).  New and material evidence will not warrant remand if it "does not add so much as to make the ALJ's decision contrary to the weight of the evidence."  *Rutkowski v. Astrue,* 368 F. App'x 226, 229 (2d Cir. 2010).

Plaintiff submitted additional evidence to the Appeals Council after the ALJ made her April 18, 2011 decision, consisting of the following: (1) a psychiatric evaluation and Psychiatric Impairment Questionnaire from Dr. Eshkenazi dated June 30, 2011; (2) additional medical records from Dr. Siskind's office dated August 14, 2009 to January 1, 2012; and (3) an MRI report dated March 2, 2011.  (Tr. 5-6; *see* 459-511; 512-522.) In a notice dated September 27, 2012, the Appeals Council stated, without discussion, that it had "found no reason under our rules to review the Administrative Law Judge's decision" and "denied [plaintiff's] request for review.  (Tr. 1.)

1.  Dr. Eshkenazi's Psychiatric Report

Dr. Eshkenazi's evaluation is new and not merely cumulative of the evidence that is already on the record. Moreover, plaintiff has demonstrated good cause for failure to submit this evidence to the ALJ because the psychiatric evaluation report (June 30, 2011) did not exist at the time of the hearing on January 25, 2011.  *See Pollard*, 377 F.3d at 193

(holding "because the new evidence submitted by [plaintiff] did not exist at the time of the ALJ's hearing, there is no question that the evidence is "new" and that "good cause" existed for her failure to submit this evidence to the ALJ.").

Dr. Eshkenazi's psychiatric evaluation report constitutes material evidence of plaintiff's psychiatric condition during the relevant period. New evidence is material if it is (1) relevant to the plaintiff's condition during the period for which benefits were denied, spanning from the alleged onset date through the ALJ's decision and (2) shows a "reasonable possibility" that new evidence would have influenced the Commissioner to decide the plaintiff's application differently. *Felix v. Astrue*, No. 11-CV-3697, 2012 WL 3043203, at *12 (E.D.N.Y. July 24, 2012); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988). Here, although the psychiatric evaluation report post-dates the ALJ's decision, the substance of the report is relevant to the time period during which plaintiff is claiming he was disabled. Indeed, Dr. Eshkenazi opined that the earliest date the mental limitations described in his evaluation apply to plaintiff's condition is July 2009. (Tr. 522.) Thus, this retrospective diagnosis is relevant to the time period for plaintiff's disability determination. *See Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (noting that retrospective diagnoses are valid under the Social Security Act); *Raufova v.*

*Chater*, No. 94-CV-5007, 1995 WL 561340 (E.D.N.Y. Sept. 20, 1995)
(holding that although the first treatment started after the
hearing and denial of appeals, the psychiatrist's report filed
as additional evidence related back to the relevant period of
the benefit sought and the plaintiff's retrospective diagnoses
was relevant to the disability determination); *see also Bosmond
v. Apfel*, No. 97-CV-4109, 1998 WL 851508, *12 (S.D.N.Y. Dec. 8,
1998) ("A post-determination diagnosis that indicates true
disability prior to the ALJ determination is relevant — whether
the diagnosis relates to a previously unrecognized condition, or
whether it reveals the depth of an illness recognized, but not
fully appreciated at the time of the hearing.").

Furthermore, the psychiatric evaluation bears on
plaintiff's mental conditions and there is a reasonable
probability that the evidence would have influenced the
Commissioner to decide the plaintiff's application differently.
In his report, Dr. Eshkenazi's diagnosed generalized anxiety,
dysthymic disorder, and heart problems (shortness of breath)
that resulted in the plaintiff being incapable of even low work
stress, likely absence from work more than three times a month,
and inability to carry on gainful employment. (Tr. 514.) This
evidence supports and corroborates the plaintiff's contentions
that his fatigue and pain inhibit him from gainful employment.
*See Pollard*, 377 F.3d at 194 (finding that the new evidence of

the plaintiff's psychological state corroborates the plaintiff's contention that he is limited in maintaining a healthy emotional and physical state, and thus, is "pertinent and probative" to the plaintiff's condition). The ALJ found that, "[w]ith regard to his allegations of significant fatigue, the record does not corroborate [plaintiff's] statements." (Tr. 29.) Because the ALJ disregarded plaintiff's self-reports regarding his fatigue, and did not afford significant weight to any of the treating or consultative physicians' opinions regarding plaintiff's fatigue, the new evidence would be a material factor in the ALJ's assessment of plaintiff's RFC. Accordingly, on remand, the ALJ should consider Dr. Eshkenazi's psychiatric report.

2. <u>Dr. Siskind's Additional Medical Reports</u>

Plaintiff submitted additional reports from Dr. Siskind dated August 21, 2009 through January 1, 2012. (*See* Tr. 459-510.) Many of the reports, for example an EKG Stress Test Work Sheet dated August 21, 2009 and the results of an EKG Stress Report dated August 4, 2010, were previously provided to the ALJ and are therefore cumulative. (Tr. 462-76, 481.)

Although Dr. Siskind's August 4, 2010 test results were not previously provided to the ALJ, they are based on the same test for which results were reported by Dr. Blum and do not provide new information. (*See* Tr. 424.) Moreover, the additional treatment notes that were not previously provided to

the ALJ are merely cumulative to those already in the record. *Houston*, 2014 WL 4416679, at *8 (internal citation omitted). For example, in a report dated September 28, 2010, Dr. Siskind noted plaintiff's ability to walk ten blocks before stopping due to shortness of breath and that he had good exercise capacity on his stress test. (Tr. 500.)

The ALJ already relied on similar evidence that plaintiff had shortness of breath upon physical exertion, and that he needed to take breaks during prolonged activity, in reaching the conclusion that plaintiff's RFC was consistent with sedentary work. Thus, the "new" evidence consisting of Dr. Siskind's treatment notes is duplicative but may be considered on remand.

### 3.    MRI dated March 2, 2011

Plaintiff submitted an MRI report from the New York Hospital Queens dated March 2, 2011 to the Appeals Council. (Tr. 455-58.) The MRI report indicated that plaintiff suffered from atheromatous disease of the infra-renal abdominal aortas and that there was an infra renal abdominal aortic aneurysm present. (Tr. 456.) The MRI also showed ectasia, or a distention, of both common iliac arteries, moderate stenosis in the left external iliac artery by 50%, multiple severe stenosis and short segment occlusions of the left anterior tibial artery (arteries in the lower leg), and mild stenosis in the right

anterior tibial artery. (Tr. 457-58.) Although the examination was conducted on March 2, 2011, it is not clear when the results were reported. In any event, the report was not available at the time of plaintiff's hearing, thus the report is "new" and good cause is established. *Pollard*, 377 F.3d at 193; *Patterson v. Colvin*, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014) (internal citation omitted); *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 341 (E.D.N.Y. 2010).

Although the MRI report is material and relevant to the disability period alleged by plaintiff, and provides supplemental evidence with respect to plaintiff's complaints about his leg pain upon walking and his inability to sustain prolonged activity due to fatigue, the ALJ already determined that plaintiff was limited in his ability to walk and stand. New and material evidence will not warrant remand if it "does not add so much as to make the ALJ's decision contrary to the weight of the evidence." *Rutkowski v. Astrue,* 368 F. App'x 226, 229 (2d Cir. 2010). Nonetheless, the new evidence of plaintiff's MRI may be considered on remand.

## CONCLUSION

For the foregoing reasons, the court remands this case for further proceedings consistent with this opinion. Specifically, the ALJ should:

(1) Review the totality of the evidence in the record and, if she declines to afford controlling weight to Dr. Siskind's opinion regarding plaintiff's physical limitations, in particular, plaintiff's inability to sit for prolonged periods of time, provide a clear and explicit statement of the "good reasons" for the weight she does accord Dr. Siskin's opinion in accordance with the factors stated in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and reconcile Dr. Siskind's opinion with the opinions of non-examining sources as well as other evidence in the record to adequately explain the ALJ's RFC determination;

(2) Assess plaintiff's credibility and provide the specific findings in order to enable effective review; and;

(3) Consider the new evidence submitted to the appeals council, in particular, the psychiatric report provided by Dr. Eshkenazi.

**SO ORDERED.**

Dated: Brooklyn, New York
        October 15, 2015

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York